697 S.E.2d 690

**Renee M. HIGH, Respondent/Appellant,**

v.

**John A. HIGH, II, Appellant/Respondent.**

**No. 4717.**

Court of Appeals of South Carolina.

Submitted June 1, 2010.

Decided July 28, 2010.

230

232

Marian D. Nettles, of Lake City, and John M. Prosser, Jr., of Johnsonville, for Appellant/Respondent.

V. Lee Moore and Elizabeth J. Saraniti, of Surfside Beach, for Respondent/Appellant.

PER CURIAM.

In this child custody case, John High (Father) appeals from the family court's order granting Renee High (Mother) sole custody of the couple's two children, arguing the family court erred in: (1) refusing to qualify Teressa Harrington, LPC as an expert witness; (2) prohibiting the introduction of statements made by the couple's minor daughter to Harrington; (3) refusing to admit Harrington's records into evidence; (4) making certain findings of fact relevant to the issue of custody which are not supported by the record; (5) failing to consider important factors contained in the record in its award of primary custody to Mother; (6) awarding Mother sole custody based on the fact that Mother was historically the caregiver of the minor children; and (7) granting Mother custody based on the primary caretaker factor. In her cross-appeal, Mother argues the family court erred in (1) hearing Father's untimely motion to alter or amend, and (2) failing to award her attorney's fees and costs. We affirm.[1]

## FACTS

Mother and Father were married on May 4, 1996, and subsequently the couple parented two children, Daughter and Son. A day after their ten-year anniversary, Father confronted Mother about having an affair. Mother admitted to the affair, and the parties separated. After the separation, Father admitted he had several affairs early in the marriage.

On June 29, 2006, Mother filed a complaint seeking an order of separate support and maintenance. Mother also requested sole custody of the minor children, child support, equitable

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

distribution of the assets and debts, a personal restraining order, and attorney's fees.[2] She later filed a supplemental complaint to request a divorce on the ground of one-year separation. Father filed an answer and counterclaim requesting the same relief and a divorce on the ground of adultery. Mother filed a reply including the affirmative defense of recrimination. Prior to trial, Mother and Father reached an agreement concerning the children's health insurance, equitable division of the assets and debts, alimony, tax liability, and communications between the parties, and the terms were included in the final order filed on October 25, 2007.

Mother proceeded with the divorce on the ground of one year's separation, and a four-day trial was held on October 22 and 25, 2007, and January 15 and 16, 2008. During the trial, the court heard the remaining issues of divorce, custody, visitation, child support, Guardian ad Litem fees, and attorney's fees, as well as a Rule to Show Cause filed by Mother seeking to have Father held in contempt of court for violation of the temporary order. On May 8, 2008, the court issued a final order, granting Mother's divorce from Father and awarding Mother sole custody of the children and child support. The order also divided the Guardian ad Litem costs, requiring Mother to pay $3,701.95 and Father to pay $6,000. The court also issued an order on the Rule to Show Cause, holding Father in contempt of court.[3] Neither party filed a motion for reconsideration within the ten-day time period pursuant to Rule 59(e), SCRCP; however, on June 6, 2008, the family court filed a supplemental order with consent of the parties to

---

**2.** On September 27, 2006, the Family Court issued a temporary order in which the court granted the parties joint custody of the children, ordered Father to pay child support to Mother, and prohibited the parties from (1) having the children in the presence of a paramour; (2) discussing or allowing third parties to discuss the case in the presence of the children; and (3) having any contact with each other, "including telephone, e-mail, in person, at their homes, their places of business or any other place or allowing any third party to do so." This order was amended on November 2, 2006, to increase the amount of child support by fifteen cents.

**3.** The family court found Father had violated the terms of the September 27, 2006 temporary order by discussing the case with Daughter and constantly and repeatedly harassing Mother by telephone and e-mails. The court also ordered Father to pay Mother's attorney's fees for the Rule to Show Cause.

address the restraining order language because Father was concerned it would impact his job as a police officer. On June 18, 2008, Father filed a motion to alter or amend the judgment. Mother filed a memorandum in opposition to the motion to alter or amend the judgment, and a hearing on the matter was held on September 30, 2008. In its order denying Father's motion, filed on January 21, 2009, the court found the motion was untimely and only raised issues that were fully addressed in the May 8, 2008 order, which had not been modified by the June 6, 2008 order; however, the court addressed the merits of Father's motion. Mother and Father both appealed to this court, and Mother filed a motion to dismiss Father's appeal,[4] which was denied on April 13, 2009.

## STANDARD OF REVIEW

In an appeal from the family court, this court has the jurisdiction to correct errors of law and find facts in accordance with its own view of the preponderance of the evidence. *Fiddie v. Fiddie*, 384 S.C. 120, 124, 681 S.E.2d 42, 44 (Ct.App.2009). "Although this court may find facts in accordance with our own view of the preponderance of the evidence, we are not required to ignore the fact that the [family] court, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony." *Id.* "In particular, an appellate court 'should be reluctant to substitute its own evaluation of the evidence on child custody for that of the [family] court.'" *Chastain v. Chastain*, 381 S.C. 295, 302, 672 S.E.2d 108, 111 (Ct.App.2009) (quoting *Woodall v. Woodall*, 322 S.C. 7, 10, 471 S.E.2d 154, 157 (1996)); *Altman v. Griffith*, 372 S.C. 388, 393, 642 S.E.2d 619, 622 (Ct.App.2007) (stating custody determinations largely rest in the sound discretion of the family court judge); *Shirley v. Shirley*, 342 S.C. 324, 330–31, 536 S.E.2d 427, 430 (Ct.App.2000) ("Custody decisions are matters left largely to the discretion of the [family] court."); *Paparella v. Paparella*, 340 S.C. 186, 189, 531 S.E.2d 297, 299 (Ct.App.2000) (noting appellate courts should be reluctant to

---

4. Mother argued Father's appeal should be dismissed because Father's motion to alter or amend was not timely filed.

supplant the family court's evaluation of witness credibility regarding child custody).

## LAW/ANALYSIS

### I. Father's Appeal

**A. Expert Witness**

██ First, Father argues the family court erred in refusing to qualify Teressa Harrington as an expert witness by misapprehending the law relevant to the admission or exclusion of expert witnesses. We disagree.

██ It is within the family court's discretion to determine whether a witness is qualified as an expert and whether his or her opinion is admissible on a fact in issue. *Edwards v. Edwards*, 384 S.C. 179, 183, 682 S.E.2d 37, 39 (Ct.App.2009). "On appeal, the family court's ruling to exclude or admit expert testimony will not be disturbed absent a clear abuse of discretion." *Id.* "There is no abuse of discretion as long as the witness has acquired by study or practical experience such knowledge of the subject matter of his testimony as would enable him to give guidance and assistance to the jury in resolving a factual issue which is beyond the scope of the jury's good judgment and common knowledge." *Gadson v. Mikasa Corp.*, 368 S.C. 214, 228, 628 S.E.2d 262, 270 (Ct.App. 2006). "The party offering the expert has the burden of showing the witness possesses the necessary learning, skill, or practical experience to enable the witness to give opinion testimony." *Id.* "Defects in an expert witness' education and experience go to the weight, not the admissibility, of the expert's testimony." *Edwards*, 384 S.C. at 183, 682 S.E.2d at 39 (quoting *Peterson v. Nat'l R.R. Passenger Corp.*, 365 S.C. 391, 399, 618 S.E.2d 903, 907 (2005)).

Father alleges the family court incorrectly held that prior qualification as an expert was a precondition to admission of an expert. At trial, Father sought to have Harrington, a licensed professional counselor, qualified as an expert in child counseling. Mother objected to Harrington being admitted as an expert because Harrington did not have any published works that were recognized and relied upon by other professionals in her field. Additionally, Mother objected because

Harrington had only spoken on topics like educational counseling techniques, and she had never testified in court before this case. Mother stated she did not object to Harrington testifying about the treatment she provided to Daughter. The court allowed Harrington to testify and reserved the right to rule on whether she was an expert.

 In its June 6, 2008 order, the court stated it had considered Harrington's testimony, but the court had declined to admit Harrington as an expert in child counseling. The order noted that Harrington had never testified in court, and therefore, had never been admitted as an expert in any court proceeding concerning child custody, but did not state that was the reason it had declined to admit her as an expert. In the court's order denying Father's motion to alter or amend, the court further addressed the issue:

> As far as the counselor is concerned whom [Father] maintains should have been admitted as an expert, although she had extensive experience in counseling children, such experience does not necessarily qualify her as an expert in child custody matters. It was clear to this Court that [Father] had exercised undue influence over the child. Even if she had been qualified as an expert witness, her opinion was that it was the desire of [Daughter] to be with [Father] and that [Daughter] would have a more difficult time in adjusting if [Mother] were granted custody. Such opinion would not have changed my ruling as I had to consider numerous factors. . . . The Court did consider the counselor's testimony as a whole and noted that the child exhibited better coping skills at the end of the counseling sessions.

We find the family court did not abuse its discretion in refusing to qualify Harrington as an expert in child counseling. Furthermore, we find Father was not prejudiced by the court's decision because the court allowed Harrington to testify and considered her testimony in making its decision.

 Second, Father argues the family court erred in prohibiting the introduction of statements made by Daughter to Harrington. We disagree.

Father sought to have the statements made by Daughter to Harrington during the course of her treatment admitted under

Rule 703, SCRE. However, Rule 703, SCRE, only applies to experts, and the family court found Harrington was not qualified as an expert in child counseling; therefore, the court properly excluded the introduction of statements made by Daughter to Harrington. *See* Rule 703, SCRE; *Jones v. Doe,* 372 S.C. 53, 62–63, 640 S.E.2d 514, 519 (Ct.App.2006) (holding Rule 703, SCRE, permits an expert giving an opinion to rely on facts or data "that are not admitted in evidence or even admissible into evidence"; however, it "does not allow for the unqualified admission of hearsay evidence merely because an expert has used it in forming an opinion"). Also, Rule 703 does not allow the admission of hearsay evidence simply because an expert used it in forming their opinion; it only provides the expert can give an opinion based on facts or data that were not admitted into evidence. *Id.* (quoting 2 Kenneth S. Broun et al., McCormick on Evidence § 324, at 418 (2006) and finding the expert may testify to the inadmissible evidence, but "[i]t is received only for the limited purpose of informing the jury of the basis of the expert's opinion and therefore does not constitute a true hearsay exception"). Furthermore, a family court's ruling on the admission or exclusion of evidence will only be reversed if it constitutes an abuse of discretion amounting to an error of law. *Judy v. Judy,* 384 S.C. 634, 641, 682 S.E.2d 836, 839 (Ct.App.2009).

The court permitted Harrington to give her diagnosis of Daughter's condition; however, the court would not allow her to mention any of Daughter's statements:

I don't want to hear anything the child says. If [Harrington] wants to testify as to what she diagnosed the child to have or whatever her condition is, that's fine, but I'm not hearing any hearsay concerning the child. The Court may determine on its own volition to talk with [Daughter] itself if she's as bright as everyone said she is.

Harrington was also permitted to testify to her opinion that it was the desire of Daughter to live with Father, and Daughter would have a more difficult time adjusting if Mother were granted sole custody. Further, Harrington was allowed to refer to her notes and testify about every session she had with Daughter and how Daughter was feeling at each meeting. Therefore, Father was not prejudiced by the court's exclusion of Daughter's statements. As a result, we find the family

court did not abuse its discretion in prohibiting the introduction of statements made by Daughter to Harrington.

 Third, Father argues the family court erred in refusing to admit Harrington's records into evidence. We disagree.

 A family court's ruling on the admission or exclusion of evidence will only be reversed if it constitutes an abuse of discretion amounting to an error of law. *Judy,* 384 S.C. at 641, 682 S.E.2d at 839. Evidence is relevant if it tends to establish or make more or less probable some matter in issue upon which it directly or indirectly bears; however, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Id.* Determinations of the relevance of evidence rest within the family court's discretion. *Id.*

Father sought to have Harrington's complete record on Daughter admitted into evidence and Mother objected, arguing it contained hearsay statements made by Daughter to Harrington and Daughter was available to testify. Father argued Harrington's records were admissible under Rule 803(6), SCRE, the Business Records Exception to the hearsay rule. Rule 803(6) provides that memorandum, reports, records, or data compilation, in any form, of acts, events, conditions, or diagnoses can be admissible if they are (1) made at or near the time of the event recorded; (2) prepared by someone with or from information transmitted by a person with knowledge; (3) made and kept in the course of a regularly-conducted business activity; (4) identified by the custodian or a qualified witness who can testify regarding the mode of preparation of the record; and (5) found to be trustworthy by the court. *See* Rule 803(6), SCRE; *Ex parte Dep't of Health & Envt. Control,* 350 S.C. 243, 249, 565 S.E.2d 293, 297 (2002).

In its order denying Father's motion to alter or amend, the court stated "there was no reason or need for the records of [Harrington] to be admitted into evidence as she testified based upon her records and the Court was not going to allow the introduction of evidence which would be cumulative and which might contain hearsay testimony not otherwise admissible." Because the court permitted Harrington to review her notes and testify extensively about each of her sessions with

Daughter, we find the family court did not abuse its discretion in prohibiting the introduction of Harrington's records.

Father also argues Daughter's statements, contained in Harrington's consultation notes, were admissible under Rules 803(3) and (4), SCRE, as statements made as to her then existing mental, emotional, or physical condition and for the purpose of diagnosis and treatment. Rule 803(3) provides an exception for statements of present state of mind, emotion, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health, but does not include statements of memory or belief to prove the fact remembered or believed. Rule 803(3), SCRE. Harrington was allowed to testify about every session she had with Daughter and Daughter's preference to live with Father; therefore, we find Father was not prejudiced by the court's exclusion of Harrington's consultation notes. Rule 803(4) provides "that the admissibility of statements made after the commencement of the litigation is left to the court's discretion," and Daughter did not begin seeing Harrington until after the case was filed. Rule 803(4), SCRE. Because the admission of evidence is within the discretion of the family court, and the court did not abuse that discretion, we find the family court did not err in refusing to admit Harrington's records into evidence.

## B. Child Custody

### 1. Findings of Fact

Father argues the family court erred in making several findings of fact relevant to the issue of custody because they are not supported by the record. We disagree.

In an appeal from the family court, this court has the jurisdiction to correct errors of law and find facts in accordance with its own view of the preponderance of the evidence. *Fiddie,* 384 S.C. at 124, 681 S.E.2d at 44. However, the court is not required to ignore the fact that the family court, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Id.* Child custody decisions are matters left largely in the discretion of the family court. *Shirley,* 342 S.C. at 330, 536 S.E.2d at 430. Thus, this court should be reluctant to substitute its own evaluation of the evidence on child

custody for that of the family court. *Woodall,* 322 S.C. at 10, 471 S.E.2d at 157.

First, Father argues the family court erred in finding Mother did not discuss the litigation with Daughter. Specifically, in its order, the court stated, "unlike [Father], [Mother] would not discuss the litigation with the child as directed by the Court order." Father claims this was in error because Mother explained that she and Father had been unfaithful when Daughter asked her what the word unfaithful meant; however, Mother testified she did not remember having the conversation with Daughter. Mother's mother, Mary Michau, testified she also overheard a conversation between Daughter and Father, wherein Father told Daughter that Mother and Father had both been unfaithful, but Mother would not forgive him, and his only mistake was telling Mother the truth. Father testified he told Daughter that Mother was seeing Trotter, and he told her that he was dating a girl named Alexis. Father also testified he told Daughter an overview of what was going to happen as a result of the litigation. Further, Father was found to be in contempt of court for violating the terms of the September 27, 2006 temporary order by discussing the case with Daughter and constantly and repeatedly harassing Mother by telephone and e-mails. Mother's counselor, Margaret Judy–Kauffman, testified Mother was adamant that she did not want anyone to involve the children in the litigation. Additionally, Crystal Guyton, Mother's co-worker, testified at court that "[Daughter] was wanting to have conversations about, you know, what was going on and [Mother] was just matter of fact. She said it's an adult situation; she said that mommy is not going to discuss adult situations with you." Therefore, the record supports the family court's finding that Mother did not discuss the litigation with Daughter.

Second, Father asserts the court incorrectly surmised that "Father or someone with his interest at heart" improperly shared information with Daughter about Father's arrest.[5]

_____

5. At some point, Mother and her paramour, Edwin Scott "Scottie" Trotter, gave written statements and video-taped interviews to law enforcement that led to Father's arrest for criminal domestic violence and harassment against Mother. Officer Dustin Morris of the George-

Father asserts Daughter knew about the arrest because she was present when Father was arrested, and he denied discussing the details of the charges with her. However, Officer Morris testified that when Father was arrested, he was not handcuffed in front of the children, had freedom of movement, and was allowed to go inside and change clothes. Also, only one of the police cars was marked and only one officer was in uniform. Father testified he told Daughter an overview of what was going to happen as a result of the litigation. Harrington also testified Daughter was angry about "what she was told regarding the issues surrounding court, the charges and as a result of the court's decision," and she was concerned about whether she had been told the truth about the incident. Further, Father asserts the court incorrectly found Mother was "merely a witness" because she was an "active participant." In contrast, Officer Morris testified that Mother did not want to pursue the criminal prosecution at first, she did not have any control over whether charges were filed against Father, and she was "strictly a witness." Therefore, the record supports the family court's findings.

■■■ Third, Father states the court erred in finding Father's MySpace, written, and e-mail communications supported the granting of custody to Mother because no evidence was presented that the documents were shared with or seen by the children. Father also claims Mother sent e-mails to him mentioning her relationship with Trotter. In its order, the family court stated that after viewing the evidence and testimony, the court found that "Mother possesses the strongest ability to foster a positive parent/child relationship between the minor children and ... Father." The court noted it "observed great hostility, animosity, and anger exhibited by ... Father with respect to ... Mother." The court stated the contents of e-mails between Mother and Father also sup-

town County Sheriffs Department testified that Mother did not initiate the matter and she was reluctant "to get this thing rolling." Trotter testified that he did not tell Mother he contacted the police about Father's threats against him, and it was a co-worker that told Mother about it. Father was a police officer for the City of Jamestown, South Carolina, and as a result of the allegations, Father was arrested and placed on unpaid administrative leave for four months. After a trial in March 2007, Father was found not guilty of both charges.

ported awarding custody to Mother, and the court commented that one of Father's MySpace comments was disturbing:

> The court is further disturbed by the statement of [Father] contained in his myspace [sic] web page admitted into evidence ... wherein he states, "I'm actually a little sorry for [Mother] just because losing her job affects my children. Well, maybe not. Now I'm financially more than able to support them if [Mother] gets out of the way or is pushed out. I can provide them the life they deserve and even better that [sic] they lost ... I have a wonderful life planned with a wonderful woman and my only goal now is making sure my children share it with us.

Therefore, we find the record supports the family court's findings.

Fourth, Father claims the court erred in finding Father told Daughter she had to choose between her parents and she was unduly influenced by Father in her preference to live with him. The court's order states, "The evidence presented to the Court also proves that the minor daughter in this action was told that she had a choice to make in this matter concerning which parent she wanted to have custody of her." Harrington testified that Daughter expressed to her that she did not want to choose between her parents and she thought Harrington was going to help her choose. The order does not state it was Father who told her she had to choose. The order does state the court found "that [Daughter] was unduly influenced by [Father] in her stated preference to live with him," and Daughter had not reached "the age or maturity level to decide what is in her best interest and particularly where or who she lives with in this matter." Harrington testified that Daughter placed a majority of the blame on Mother for the breakup of the family, the loss of the family home, and Father's arrest. Harrington also said Daughter was angry at Mother because she thought Mother was not telling her the truth about the divorce, and when they tried to work on communication, it was "like [Daughter] had already made up her mind ahead of time what the correct answers were." Father testified he discussed the divorce with Daughter by giving her an overview of what was going to happen, whereas Mother did not want to involve the children in the

litigation. Therefore, the evidence supports the family court's finding that Daughter was influenced by Father in her preference to live with him.

■ Finally, Father argues the court erred by stating that Mother was terminated from her job because of Father's "constant harassment of Mother by e-mails and telephone calls during office hours." Father asserts Mother sent him an e-mail from her work e-mail account telling him that Trotter had just left the office, thereby sharing the responsibility for her ultimately losing her job. Father also states that if the loss of a job is a relevant factor to be considered in the child custody analysis, that the court should have considered that Mother's allegations about Father led to his arrest and being placed on unpaid administrative leave for four months. However, Father was found to be in contempt of court for violating the terms of the September 27, 2006 temporary order by constantly and repeatedly harassing Mother by telephone and e-mails. In that order, the court found Father "constantly and repeatedly harass[ed] [Mother] through e-mails and telephone calls, such that as a result of [Father's] conduct, [Mother] lost her job." Crystal Guyton, who worked with Mother, testified that Father would often call and e-mail Mother at work and she would get upset, which disrupted their work. Also, Mother's employer wrote a letter to the parties' attorneys stating that Father had been contacting Mother at work, and requesting that he cease contacting her at work. Therefore, we find the evidence supports the family court's finding that Mother was terminated from her job because of Father's harassment of Mother by e-mails and telephone calls.

## 2. Child Custody Factors

■ Father argues the family court erred in failing to consider important factors contained in the record in its award of primary custody to Mother. We disagree.

■ The controlling considerations in child custody cases are the welfare of the children and what is in their best interest. *Ford v. Ford*, 242 S.C. 344, 349, 130 S.E.2d 916, 920 (1963). In making its determination on custody, the family court should consider the character, fitness, attitude, and inclinations on the part of each parent as they impact the

children, as well as the psychological, physical, environmental, spiritual, educational, medical, family, emotional and recreational aspects of the children's lives. *Woodall,* 322 S.C. at 11, 471 S.E.2d at 157. "[A]ll the conflicting rules and presumptions should be weighed together with all of the circumstances of the particular case, and all relevant factors must be taken into consideration." *Id.* While this court has jurisdiction to correct errors of law and find facts in accordance with its own view of the preponderance of the evidence, child custody decisions are matters left largely in the discretion of the family court. *Shirley,* 342 S.C. at 329–30, 536 S.E.2d at 429–30. Thus, this court should be reluctant to substitute its own evaluation of the evidence on child custody for that of the family court. *Woodall,* 322 S.C. at 10, 471 S.E.2d at 157.

Father asserts the Guardian ad Litem noted Daughter had a closer relationship with Father than Mother, Daughter preferred to live with Father, and Father was a "very fit" parent. In contrast, Father claims the Guardian ad Litem noted Daughter was in the process of "working through" her resentment of Mother, and Mother was just a "fit" parent. Father also asserts Harrington testified she thought Daughter was adjusted to the joint custody arrangement, and Daughter would have a greater adjustment period if she were required to live primarily with Mother due to Daughter's anger issues toward Mother.

In its supplemental final order, the court specifically addressed the factors it considered in making its decision to award Mother sole custody of the children:

There are many factors which have been considered by this Court ... including: who has been the primary caretaker; the conduct and character of the parties; the fitness of each parents [sic] to handle the physical and emotional needs of the children; conduct which would affect the welfare of the children; the willingness of each parent to facilitate a relationship between the child and the other parent; attitude and inclinations on the part of each parent as they impact the children and the psychological, physical, environmental, spiritual, educational, medical, familial, emotional and recreational aspect of the children's life. Considering the totality of the circumstances and all evidence presented as well as the credible testimony of ... Mother, ... Moth-

er's witnesses and the testimony of ... Father of which the court did not find to be credible at all times and ... Father's witnesses, it is in the minor children's best interest for ... Mother to have physical custody and the legal right to make all decision making with respect to the minor children with ... Father having visitation.

Thus, the family court properly considered all the factors it is required to consider when making a child custody determination. Additionally, although this court may find facts in accordance with our own view of the preponderance of the evidence, the family court was in a better position to evaluate the witnesses' credibility and assign comparative weight to their testimony. Therefore, we find the family court did not err in awarding Mother sole custody of the children.

### 3. Caregiver Consideration

Father argues the family court erred in awarding Mother sole custody based on the fact that Mother was historically the caregiver of the minor children. We disagree.

In South Carolina, the rule is there is no preference given to the father or mother in regard to the custody of the child, and "[t]he parents stand in perfect equipoise as the custody analysis begins." *Kisling v. Allison*, 343 S.C. 674, 678, 541 S.E.2d 273, 275 (Ct.App.2001). However, "[a]lthough there is no rule of law requiring custody be awarded to the primary caretaker, there is an assumption that custody will be awarded to the primary caretaker." *Patel v. Patel*, 359 S.C. 515, 527, 599 S.E.2d 114, 120 (2004).

Father argues the court erred in placing "a great deal of emphasis" on the fact that Mother had been the primary caretaker of the children. Also, in making the custody decision, Father argues the court failed to consider that Father is now the Chief of Police for Jamestown and can set his own work schedule, whereas Mother now works a full work day. Additionally, Father asserts the court failed to consider that Mother has been unwilling to share important dates and holidays with Father, while Father has been more amenable.

We already found the family court properly considered all of the factors it should consider when making a child custody determination. Also, although we may find facts in accordance

with our own view of the preponderance of the evidence, we noted the family court was in a better position to evaluate the witnesses' credibility and assign comparative weight to their testimony. Therefore, we find the family court did not err in awarding Mother sole custody of the children.

## II. Mother's Appeal

### A. Motion to Alter or Amend

■■■ Mother argues the family court erred in hearing Father's untimely motion to alter or amend. We disagree.

Mother argues Father failed to file his motion to alter or amend the May 8, 2008 order within ten days after May 14, 2008, the date the notice of judgment was mailed to all parties. The supplemental order was filed on June 6, 2008, and Father filed his Rule 59(e), SCRCP, motion on June 18, 2008. Mother also asserts Father filed his motion based on the supplemental order; however, the grounds of his motion only addressed issues that were fully addressed in the May 8 order, and not modified by the June 6 order.

The supplemental final order states that the May 8, 2008 order inadvertently omitted language that both parties had agreed to include; "therefore, such Order is rescinded *ab initio* and replaced by this Order." Black's Law Dictionary states that the term *ab initio* is Latin for "from the beginning." Black's Law Dictionary 4 (7th ed.1999).

Mother does not disagree it was the parties' intent to void the first order to protect Father's job as a police officer. However, she asserts the family court judge lost jurisdiction to modify the May 8 order because the term had ended and only the correction of clerical errors could be made after that time. She also asserts that because the second order was filed after the court had lost jurisdiction to alter the order and with the consent of the parties, it was akin to a consent order, which cannot be attacked by the parties either by direct appeal or in a collateral proceeding.

In an affidavit filed March 10, 2009, Father's attorney, John Prosser, states the family court signed Mother's proposed order on May 8, 2008, prior to Prosser's review of the order, and mailed it to Prosser on Saturday, May 10, 2008.[6] Prosser

---

6. This is also recounted in a letter from Prosser to Judge Holmes, dated August 20, 2008.

states he received the order on or after Monday, May 12, 2008, and a telephone conference was held between the court and counsel on Wednesday, May 14, 2008. Prosser asserts that during the conference, the parties agreed the order was signed prematurely and would be held void *ab initio.* The supplemental order was signed by the court on Monday, June 2, 2008, and filed on June 6, 2008. Prosser claims he did not receive a copy of the supplemental order until June 9, 2008, and he filed the Rule 59(e), SCRCP, motion on June 18, 2008.

There are few family court cases in South Carolina concerning the effect of the phrase "*ab initio.*" In *Lukich v. Lukich,* 368 S.C. 47, 627 S.E.2d 754 (Ct.App.2006), affirmed by 379 S.C. 589, 666 S.E.2d 906 (2008), this court was faced with the question of whether an annulment order declaring Wife's first marriage void *ab initio* related back so as to validate her purported second marriage. This court found that "an annulment that declares a pre-existing marriage void *ab initio* does not relate back so as to give validity to a marriage that was bigamous before the annulment was granted." *Id.* at 55, 627 S.E.2d at 758. Therefore, had the second marriage occurred after the annulment declaring the marriage void *ab initio,* the second marriage would have not been bigamous because legally the first one had never occurred. *Id.; see Joye v. Yon,* 355 S.C. 452, 455, 586 S.E.2d 131, 133 (2003) ("A subsequent marriage that is void *ab initio* is deemed to never have existed."); *Rodman (Fried) v. Rodman,* 361 S.C. 291, 296, 604 S.E.2d 399, 402 (Ct.App.2004) ("There is no legal distinction between a marriage which is annulled and one terminated by reason of bigamy, as they are both void *ab initio,* or 'from the inception.' ").

Thus, in this case, because the first order was rescinded *ab initio* it was as if it had never existed. As a result, the second order, filed June 6, 2008, was the only order from which Father could have filed a motion to reconsider, and his motion was timely filed. Therefore, we find the court did not err in hearing Father's motion.

## B. Attorney's Fees

Mother argues the family court erred in failing to award her attorney's fees and costs. We disagree.

 In family court, the award of attorney's fees is left to the discretion of the judge and will only be disturbed upon a showing of abuse of that discretion. *Tracy v. Tracy,* 384 S.C. 91, 100, 682 S.E.2d 14, 19 (Ct.App.2009). In determining whether to award attorney's fees, the court should consider four factors: (1) each party's ability to pay his or her own fee; (2) the beneficial results obtained by the attorney; (3) the parties' respective financial conditions; and (4) the effect of the attorney's fee on each party's standard of living. *Griffith v. Griffith,* 332 S.C. 630, 645, 506 S.E.2d 526, 534 (Ct.App. 1998). The court must consider six factors when determining the amount of attorney's fees to award: "(1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; and (6) customary legal fees for similar services." *Glasscock v. Glasscock,* 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991).

Mother argues the family court failed to take into consideration that her income is used to support herself and her two children, and even though she receives child support from Father, her monthly expenses exceed her monthly income. Therefore, she asserts the court erred in refusing to award her attorney's fees and costs. Also, Mother asserts she attempted to settle the case several times, but Father declined her proposals. She claims that her attorney's fees would have been greatly reduced had he accepted the offers.

In determining whether to award attorney's fees, the family court stated it had reviewed the *Glasscock* factors, and specifically considered (1) the nature and difficulty of the case; (2) that the bulk of the time was devoted to child custody; (3) that the hourly fees were reasonable and customary for similar services; (4) and that both parties were financially capable of paying their own fees. Therefore, the court determined that each party was responsible for their own attorneys' fees. We find no error in this determination.

## CONCLUSION

Accordingly, the family court's order is

**AFFIRMED.**

HUFF, SHORT, and WILLIAMS, JJ., concur.